There is no doubt in this case that we have a Confrontation Clause violation with the wrongful admission of the Medina Statement, a 15-page transcript of her interview with police. The question on appeal is whether the statement and the contents of the statement had a substantial and injurious effect upon the determination of the jury's verdict. I submit that we don't need to look much further than the government's reliance upon the Sandy Medina Statement in its opening and closing and rebuttal arguments in this case to determine that at least at the time that this case was tried, the government felt that it needed to rely upon the statement and the contents of that statement. They may say something different today in retrospect. Sotomayor Is that really correct? Is it really correct that we ignore everything that went on during the whole trial because the government referred to this in the opening and closing? Absolutely not. I think that the U.S. Supreme Court is pretty clear that we have to consider everything that happened in the trial, not just the government's reliance upon the Medina Statement. But you just said that we don't have to look any further than that. I don't think we do in this particular case because if you look at all of the evidence that was presented, there was lots of holes of reasonable doubt. Everywhere you turned, there were issues about doubt. And so the government used this statement to plug those holes. And so my position is that we don't really need to look a lot further than their reliance upon the statement because that was the way that it was used. Counsel, if you look at the testimony of Taylor and Delaney, it seems extraordinarily strong. And it's just hard to see how excising that statement and looking at the remainder of the record, there was any possibility of a different result. Well, first of all, that's not the standard. You know, think about it. No, but it's actually more favorable to you than the real standard. Well, actually, I don't think that's the case. I mean, if you go ahead. Let's leave aside the exact verbatim way that the standard is stated. Without you can state it however you want. But what I'd like you to focus on is with the testimony of Taylor, Delaney, Johnson, and the other evidence in the record, what's your argument as to why you should win notwithstanding that extensive testimony? And as you're asking Judge Graber's question, I hope you'll answer my question as well and can incorporate it there, which is what is it that Sandy Medina's testimony provided here that didn't come from somebody else? Okay. Maybe a better way to say it. So in the statement, she talks about how the pager codes were used. Captain Delaney testified about the pager codes and how he thought they were used. But that was his interpretation. And his interpretation was based upon Sandy Medina's confirmation, which came from her statement. Now, there were a couple of It's all corroborated by Well, that's the question. I mean, actually, the police only seized 74 kilograms, and much of that was not corroborated by the pager codes. There were only a couple of incidents where the pager codes actually led to any arrest with cocaine. That's part of the issue. So that's the first thing. And with respect to Delaney, I mean, he did a good job. He was doing the best that he could, but he was also a novice at pager code interpretation. And the defense did a pretty good job of showing that he had no firsthand They've also got LeVon Taylor testifying as to the codes. Right. LeVon Taylor testified to the codes. LeVon Taylor was an informant who was facing a life sentence who was trying to reduce his situation. He did not have firsthand contact with Davis in any physical way. He testified that he did talk to him on a couple of occasions. He said that he talked to a man that he knew was slow on the phone. And he thought that that was Davis. And he thought it was Davis. And he used the number 84 in connection with him. But the difference with Medina's testimony, because, see, this was the issue that the defense was raising. They said, look, there's no evidence that Mr. Davis had any contact with cocaine. There were no surveillance videos of him with cocaine. None of the audio taped conversations during the six-month wiretap had any overt conversations about cocaine. So there was a lot of sort of missing evidence. The thing about LeVon Taylor is he didn't have any firsthand experience with Davis transacting cocaine either. Nor did Delaney. Delaney never saw him doing anything like that. Nor did any of the police. So what Sandy Medina's statement did is it provided that credibility. She said, Davis took the cocaine from me. He was there. I gave it to him. She was the one that was able to bring it all together and lend credibility to their testimony that was a little bit had some holes in it. I'm not saying it wasn't completely credible. I'm just saying that it had some holes in it for which the jury could have found reasonable doubt. Now, one of the things that I also want to address today is the motion to strike, which is regarding the transcripts from the telephone calls. I don't know if the court has any questions about that. No questions about that? I mean, I don't think that ‑‑ I just want to make sure that it's clear that I object to any reference to the contents of those phone calls during this proceeding because it is part of my motion to strike. So, you know, back to the standard of review, I think it's important to ‑‑ one of the analogies I use to describe it to clients is, you know, if the body has cancer and you cut out the cancer and the body can still live and is cancer free, that's sort of analogous to the standard under Chapman, which is you take out the error and you see if there's substantial evidence to convict. And if there is, you have harmless error. With the Breck standard, you have a slightly different approach. You look to see if the cancer has so permeated the body that you can't cut it out. You can't surgically remove it. And I think that's what we have in this case, is we have Medina's statement repeatedly referring to various aspects that were various points of fact that were questionable or missing from the trial. I'll reserve the rest of my time. You may do that. We'll hear from the government. May it please the Court, good morning. I'm Laurie Gray for the United States. Evaluating Sandy Medina's statement using the five factors that the Supreme Court says guides this Court's analysis, the record shows that the statement did not have a substantial injurious effect or influence in determining the jury's verdict. The evidence in this case was overwhelming. And with regard to the arguments in closing, the government's closing was three and a half hours long. There was It started out with this, referring to this statement. Not in the closing, Your Honor, but in the rebuttal. Yes, in the rebuttal, which was an hour long. And in referring to Sandy Medina's statement, it was often at the tail end of the list of all the other evidence that Your Honors have referred to. It's pretty clear that the government put a lot of weight on Medina's statement in the closing. I mean, far disproportionate to the amount of her testimony compared with the rest of the trial. The trial goes on for almost, you know, two months. Two months, Your Honor. Medina's, you know, the Medina colloquy that occurs probably took 15 minutes. But, you know, and that the proportion of 15 minutes to a five-month or to a two-month trial is way out of proportion to what happens in the closing argument. The government clearly uses it heavily in the closing argument. Well, I, Your Honor, would disagree with that characterization that it was heavily. If you take a look at it, I think that we did rely on it, but not heavily. And the district court looked at that, and in its order at Excerpt of Record, Volume 1, page 16, noted that the government's reference to Medina's statement closing does not change the existence and the weight of physical and other testimonial evidence presented to the court over the course of the weeks dedicated to trial. It's the same judge who's lived with this for the ---- I'm sorry, Your Honor? This is the same district court judge who's lived with this for all of these. Yes. Yes. Judge Jensen was a district court judge, and he was the one who evaluated it when he came back, and he applied the five factors. He looked at the importance of the testimony, which becomes less and less important as you look at all the other testimony in the case, the 70 witnesses, the thousands and thousands of intercepted pagers. And with regard to the attacks on Special Agent Delaney, that was the subject of the direct appeal in this case, where, Your Honor, the court upheld, as you know, Judge Shorter, the court upheld on direct appeal that that was properly admitted, that his testimony was grounded in his review of this numerical sequence of codes and that it was tied to known events and circumstances. So you have the witness testimony of LaJuan Taylor, the Louisville drug dealer, who talked about Davis sending regular shipments, 3 to 5 kilograms of cocaine every one to two weeks, and travel records corroborated 33 trips of those. So that would be, the math would be 99 to 165 kilograms of cocaine. Robert O.G. Johnson testified. He was the Indianapolis drug dealer who Davis provided a kilogram of cocaine every two to three weeks. And Johnson testified that before he was indicted, he alone had dealt 150 kilograms of cocaine. Then, of course, as we've talked about, you have Special Agent Delaney cracking the code and going through all those numerical sequences. And the government presented in closing argument a summary chart that based on that crack code, it was 390 kilograms of cocaine. That's supported by the seizures in this case, by the over $800,000 in cash that was seized, and by defendant's lifestyle that showed the purchase and cash of boats, houses, jewelry. All of that shows the more than 150 kilograms of cocaine. The same is true with regard to the evidence as to defendant's connection to the Christie apartment. Surveillance officers saw him come and go from the access-only garage where you had to have the card. They saw him come and go five times during a one-month period that the government was up on a wire. Only defendant and his loyal lieutenant, one loyal lieutenant were heard intercepted on those phone calls. And when the search warrant was executed at the Christie Street apartment, there was evidence of drug dealing, a Money County machine, packaging, and indicia for defendant's girlfriend. So all of those things, the mountain of evidence, Your Honors, in this case. And the Court considered the lack of cross-examination when it re-looked at this when it was remanded. It said, there's five factors I have to consider, and he said, I will consider the lack of cross-examination, and then went through each of those factors. Would you – the argument is made that she provided key corroboration and that there was no evidence of the cracking of the code, the nature of the code, apart from her testimony or her statement. So could you address that? Sure. I think the key rebuttal to that, Your Honor, is they wouldn't have been able to stop her if they hadn't cracked the code. The very reason they stopped her and arrested her with 47 kilograms of cocaine is they had listened and cracked the code and watched this drug deal unfold. Right. Well, they predicted her arrival, and that was all according to Hoyle. But were there other occasions where they couldn't predict? Well, the other occasions of seizures, there was 20 taken from Lee Foley's car, four from Jason Eason, three from Darren Owens, and all of those seizures were preceded by coder pager messages. So that shows they were following this in real time, cracked the code, and then were able to make arrests. But my question was, were there predictions that didn't work out? Well, I think they failed. I thought they were successful. I think there might have been, Your Honor. I think it was de minimis in the whole scale. And then, Judge Bivey, to your point with regard to Taylor specifically, and this is at government supplemental excerpt of record 1252, call A-703. This is in January 1998, three months before Sandy Medina comes into the picture. In January 1998, defendant tells co-conspirator Taylor he's going to call him and input his code. We then see him call him and input 84. That's the kind of strong evidence in this case that shows that the admission of this charge, which the government concedes was a violation of the Confrontation Clause, not at the time, but subsequently became, that that is harmless in this case. What evidence was there to support the finding of 150 kilograms without Sandy Medina's testimony? Again, Your Honor, what we've just gone through, the testimony of LaJuan Taylor. Mostly his statement that he was getting, what, 3 kilograms a week, sometimes a little bit more. And he did it over the course of a year, missing some weeks. So we sort of roughly do that and come up with? Well, what's key, what we've come up with, Your Honor, there's 33. I think this is a key factor. Thirty-three trips were corroborated with travel tickets and information. And I think there were more than 33, but 33 trips were corroborated. So if you take 33 times 3, he said it was 3 to 5 kilos a month. The range is 99 to 165 kilos. That's just for Taylor. Then we've got? Johnson, too. We've got Johnson. And he, in cross-examination, admitted, well, I alone dealt 150 kilograms of cocaine before I was popped and indicted in this case. So there's this mountain of evidence. And as I said, the Court considered the lack of cross-examination. And defendant did attack Medina's credibility in his closing argument with regard to the delivery of 300 kilograms of cocaine to the Christie apartment. The statement says that she had deliberated three, excuse me, that she had delivered 300 kilograms of cocaine. Now, that statement doesn't connect to defendant without viewing the other evidence. But she said, I delivered 300 kilograms of cocaine to the Christie apartment. And what defense counsel says in his closing argument, and that's on February 27th, 2001, at page 78, he says, you hear my client, again, this is on a wiretap, you hear defendant talking to Rosa, who was the supplier. Medina was the girlfriend of Rosa. And he says to Rosa, what's her first name? What's her first name? And defendant goes on to argue and say, let's talk about what goes down at a stash house. And he says, if someone brings cocaine to a stash house, they don't just dump it and turn around and walk off. He says, you have to count it. You have to test it, make sure it's not a load of flour. You've got to pay for it. You've got to use a counting machine. And Medina's statement says she's been doing it every week, two weeks, three weeks, months. If true, she had to interact with my client. If true, defendant would not be saying, what's her name? That's reasonable doubt. And that's what he argued. And the district court instructed the jury, and this is an excerpt of Record Volume 2, page 106, that Medina's statement indicated she was an accomplice, and the court told the jury, you should consider such testimony with greater caution than that of other witnesses. Your Honor, do you want to – would you comment on the motion to strike? The motion to strike because of the lack of the tapes? Yes. Yes, Your Honor. The defense has raised a due process violation, and in this case, the record shows that there wasn't a due process violation because the transcripts were verified as accurate with every witness. Every witness that testified before putting in would say, yes, I have listened to the tape, I have reviewed that tape next to the transcript, and this is a true and accurate transcript. Defendant did not object to that. Defendant did not submit alternative transcripts. It just simply was a nonissue in the case with regard to that. The record shows that the court was well aware that the tapes were the actual evidence and that the transcripts were to aid. The jury was instructed on that. And Judge Jensen saw and heard this case. He was there from the beginning. There was myriad motions on the wiretap. I have a procedural question, too, that I believe, and this may be inaccurate, so that in the direct appeal, I believe that these transcripts were part of the record on the direct appeal and were not objected to in that context. And if that is the case, is that a sort of waiver or law of the case or somehow sort of precludes us from coming to a different result now? Well, I would like that to be the case, for sure. And I think that is a very good point, that it was presented. It was a large part of the excerpt to allow Your Honors to have a full review was to present the transcripts, and they were not objected to. You know, the other interesting sort of legal wrinkle I realize we're preparing for. Sotomayor So factually, I'm right that they were presented in the previous appeal as well. You're absolutely right, Your Honor. Thank you. One interesting legal wrinkle I figured out in preparing for oral argument is that what we're talking about primarily is count one, which is a CCE count. And defendant was sentenced to life in prison on that CCE count based on this mountain of evidence that we've talked about. Defendant was also convicted on count two of conspiracy with regard to Oakland activities. So Sandy Medina was relevant to count two to the extent that her testimony went to the Oakland activities. Court sentenced defendant to life imprisonment on that conspiracy. Count three was the conspiracy with the Midwest drug dealers, with Johnson and with Taylor. Defendant was sentenced to life imprisonment on that. When it came up on direct appeal, the Court vacated the sentences on count two and three because they were lesser included of count one. So if the Court were to find that this was not harmless here, and again, we strongly urge the Court to support the district court's order, but I would suggest that it would be remanded for the Court to determine whether those sentences should be reimposed. And also, it's important to remember that defendant was convicted of 79 counts. Only two counts Medina's testimony goes to. None of the other counts, for example, defense convicts. Sotomayor, count three for one. Count three is independent of Medina's testimony for sure. Yes, as are 77 other counts. Have you lived with this case for the duration? I have not. I was not the prosecutor below. I have lived with it shortly. Okay. And I'm hoping to be done with it. And so for that reason, I would ask the Court, unless there are more questions, to affirm the district court's order finding this harmless. Procedurally, there was a direct appeal in this case. Yes. Which we decided without a published opinion. It hasn't been to this Court other than that. Well, it did come back up, Your Honor, on the habeas. The first habeas, there was the Bruton. That was the Bruton, yes. And then it was found that the 84, putting in the code 84, identified defendant because of all the evidence that had come before, and the Court looked at that and said that that was a Bruton error, but it was harmless. Harmless. And then it came back down for the Court to resentence. While that was happening, Crawford came up. Crawford came up, yes. So it went back up. Actually, it went up and we opposed it. And while that was pending, Crawford came down. We then said, yes, this is a Crawford error. It needs to go back to the district court. So we are here for the third time. Third time. Okay. Thank you. And if there are no other questions, I would ask this Court to affirm the district court. Thank you. Thank you very much. Ms. Moore, you have reserved quite a bit of time, so it's all yours. Thank you, Your Honor. So just quickly, with respect to your questions about the motion to strike, yes, the transcripts were included in the direct appeal excerpts of record. But one of the key important facts is that the audio tapes were also on file with the Court. And so they were available to defense counsel, defense, and the Court for review. Also, the review in the direct appeal was very limited to the Bruton analysis of one specific aspect. But if we were to grant your motion here, we would be without the tapes and the transcripts. We would have nothing. Well, the district court didn't have either of those either. And I know counsel of the district court had the benefit of a two-month trial. We haven't had that benefit. True, but the district court had the benefit of a two-month trial more than ten years ago and has probably tried a lot of other cases since. So it would seem appropriate, when you're going to conduct an over-review, to have all of the evidence. And in particular, in this case, I wouldn't. Wouldn't the answer be then, if you think there's something incorrect in the transcripts, although that was not raised at the trial level, to just give us the tapes? I would love to have the tapes. The government doesn't have them anymore. That's the problem. I actually asked for them so that I could review the case to write my opening brief. Got it. So that was the problem. And, you know, with respect to the accuracy of the transcripts, that was never disputed because they were not the evidence. The audio tapes were the evidence. So counsel didn't dispute them because he knew that the jury wasn't going to rely upon them. For whatever strategic reason it was, there was no challenge to their accuracy previously. But the tapes were the evidence, not the transcripts. And during deliberations... I have one more question that's a procedural question. Let's assume that the government had never put in Volume 6 here. I don't know if we still have our own files in the direct appeal, but could we not go look at the excerpts of record filed in the previous iteration regarding this very case, even if they weren't in the excerpts now, as part of the records of our court and part of the records of this case? You can certainly look at the transcripts, Your Honor, but you can't conduct a proper de novo review without the audio tapes because they were the evidence. And I'm prejudiced as counsel because I can't address whether or not those audio tapes were just completely ignored by the jury. I mean, there could be an argument that they were relatively inaudible and the jury ignored them and relied upon the statement of Sandy Medina, which is precisely what the government told them. The government said, rely upon the statement of Sandy Medina, and that's a direct quote. So now with respect to some of the other arguments, one of the issues with the pager codes is that, you know, there's this mountain of evidence. But the reason there was a lot of evidence is because there wasn't any real evidence. There wasn't any direct evidence tying Davis to these transactions. The number of kilograms that was actually seized was only 74 kilograms, not 150. What was needed in order to get past the 150 mark was the statement of Sandy Medina, which corroborated what LaJuan Taylor said. One of the problems with LaJuan Taylor to address your question, Your Honor, is his pager codes did not match up with his testimony. They had a list of his pager codes in evidence, but the number of kilograms discussed in those pager codes did not match what he was saying were delivered from Davis. So there was a bit of a credibility problem, even with that aspect of his testimony, aside from the fact that he was an informant and would say just about anything. Johnson was heavily impeached. He testified that he didn't even know where the cocaine came from, and he didn't know that it came from Davis. Help me again with the motion to strike. If we were to grant on the theory that the transcripts were not what was in evidence, where are we? Good question. I think you have to look at the Donaldson case. It's not a criminal case exactly like this, but it says that you cannot conduct de novo review, and I think that if you cannot conduct proper review of a case Review of what? The entire case. If we don't accept this, we don't have a record, so therefore we have to reverse the entire case. Is that your argument? That's the argument, Your Honor. I know it sounds extreme, but it's an extreme situation. I mean, how often does this really happen? Almost never. I've never even heard of something like this happening. It's unusual to have the U.S. Supreme Court hand down a decision during that short window period of time that would somehow affect evidence in a case like it does here. So I know it sounds extreme, but that's what the case law says, so that's what I'm having to argue. So with respect to the government's reliance, again, they said in their opening statements, I'm going to tell you what the witnesses are going to tell you about what all this means, and Sandra Medina was, of course, part of this all. You're going to hear from her directly, too, not just from law enforcement. So even in the opening statement, the government is setting the table for Sandra Medina's statement, for her testimony, for the importance of it, and how they're already conceding that she has firsthand experience and the police don't. So in their opening statement, they're setting the table for how important her testimony is going to be to them. Then, of course, she doesn't testify, which surprises everyone, including the defense, who also laid the table in opening and said, we're going to partially recant it. So when she didn't testify, everyone was at a disadvantage. The government proceeded with its case, and at the 11th hour was able to get that statement in, which put them at an unfair advantage because she was never cross-examined. So we don't know if anything that she said was in her statement was credible. We do know that her statement was needed because of what the government said in its closing. You've seen the actual pager code that showed you what she says here is the way it really went down. That's what the government argued to the jury. So, in other words, if you have any worries about the pager codes and what she's saying or what anyone's saying about the pager codes, Medina is telling you that that's the way it went down. So they're relying upon her for that. The government emphasized her credibility about the pager codes and how it worked. I paged. I put a code in. Those kinds of references. They actually specifically argued that her statement supported counts 7-25, 27-29, and all of the other counts, including pager code counts, as well as count 23. So they specifically referred to certain counts. They used her statement to corroborate Taylor's statement as well. The government used her statement to confirm his unreliable testimony. You have the testimony of LeJuan Taylor. He told you we use these pager codes to communicate. And a statement from Sandy to Medina to the same effect. They talked about how she benchmarked the number of kilograms. Her statement was the benchmark for the number of kilograms. So, in other words, no matter what vagaries and inconsistencies or questions you may have about Delaney's pager code list of 390 kilograms, you can always rely on Medina's statement of 300. So she benchmarked it. In the rebuttal, the prosecutor emphasized her credibility as someone who made statements when there were no deals on the table. But her statement is also not under oath. So the reliance upon her statement right at the beginning of a rebuttal indicates how important that statement was to the government. And I can go into each of these details, but I've already done it in the brief. So I'm not going to continue with that. I will just say that Mr. Davis and his family, thank you for your time, as well as I. Thank you. Thank you, counsel. The case just argued is submitted, and we very much appreciate the helpful arguments from both counsel. It was extremely helpful to the court. So.
judges: SCHROEDER, GRABER, BYBEE